UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal Action No. 04-465 (RMC) |
| HUGO ALBERTO ROJAS-YEPES, | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OPINION ON MOTION TO MODIFY JAIL CONDITIONS**

In June of 2004, Hugo Alberto Rojas-Yepes was arrested in his native country, Colombia. On February 1, 2007, he was extradited to the United States. After a detention hearing, Magistrate Judge Kay ordered Mr. Rojas-Yepes to be held in the "general population" at the Correctional Treatment Facility ("CTF"). *See* Order [Dkt. # 43]. CTF, a facility operated by a contractor for the District of Columbia Department of Corrections (the "DOC"), is a medium-security facility and houses inmates requiring low to medium custody. Mr. Rojas-Yepes remained in general population at CTF without incident. Specifically, he worked several jobs within CTF and had been issued a "green badge" authorizing him to work both inside and outside the facility to maintain and monitor the fire safety equipment.

On May 22, 2009, the DOC received a copy of the Indictment in this case. Based on facts alleged therein, the DOC reclassified Mr. Rojas-Yepes as a "maximum custody" prisoner. *See* DOC's Response to the Court's Order to Show Cause [Dkt. # 127]. CTF is not equipped to house maximum custody prisoners and, therefore, holds them in a Special Management Unit ("SMU")[1]

---

[1] SMU appears to be equivalent to solitary confinement.

until they can be transferred to the maximum-security facility — the D.C. Jail. Thus, upon his reclassification on May 22, 2009 — two years after his arrival in the DOC — Mr. Rojas-Yepes was transferred to SMU at CTF. He did not receive notice that he would be transferred, nor was he given a reason for the transfer at that time.

Mr. Rojas-Yepes filed a Motion to Modify Jail Conditions [Dkt. # 122] on May 29, 2009, alleging that his transfer to SMU violated his rights under the Due Process Clause and requesting that he be removed from "solitary confinement" and returned to the general population at CTF. That same day, the Court issued an Order to Show Cause [Dkt. # 123] to the DOC, which is not a party to this case, requiring the DOC or an authorized agent of CTF to show cause why the Court should not grant the motion and order Mr. Rojas-Yepes returned to the general population at CTF. A show cause hearing was scheduled for June 5, 2009. Meanwhile, on June 2, 2009, Mr. Rojas-Yepes was transferred to the D.C. Jail, consistent with his reclassification as a maximum custody prisoner. Maria Amato, general counsel for the DOC, described these facts in a written Response to the Order to Show Cause and in Court at the show cause hearing on June 5. Despite his transfer out of SMU, Defendant maintains this challenge to his confinement conditions on Due Process and, implicitly, Equal Protection grounds.

This Court has jurisdiction to determine whether a defendant should be detained prior to trial, sentencing, or pending appeal under the Bail Reform Act ("BRA"), 18 U.S.C. § 3141 *et seq*. Specifically, "[a] judicial officer of a court of original jurisdiction over an offense, or a judicial officer of a Federal appellate court, shall order that, pending imposition or execution of sentence, or pending appeal of conviction or sentence, a person be released or detained under this chapter." 18 U.S.C. § 3141(b). Once a defendant is detained, however, the most appropriate means for a

challenge to the conditions of his confinement is either a *habeas corpus* petition or an action brought under 42 U.S.C. § 1983. *See Wilkinson v. Dotson,* 544 U.S. 74, 81 (2005) (holding that a prisoner can challenge conditions of his confinement under § 1983 as long as his success will not result in invalidation of his conviction or his immediate release); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal."); *Williams v. Carlson*, 826 F.2d 129 (D.C. Cir. 1987) (finding that petitioner's allegations of harassment, racial segregation in his placement, and denial of a transfer to a low-security facility were properly made in a *habeas* petition).

Mr. Rojas-Yepes argues that he need not file a separate action to challenge his detention because his claims fall within the Court's jurisdiction under the BRA. By its plain language, however, it appears that it does not the BRA does not cover this type of challenge. A court may, arguably, treat a motion such as the one filed here as a petition for a writ of *habeas corpus* or, in certain circumstances, as a petition for a writ of *mandamus*. "Since it is established that mandamus is a drastic remedy to be invoked only in extraordinary situations, mandamus would potentially lie in the present case only if the complaint fell outside the reach of habeas (or if habeas was inefficacious)." *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 806 n.2 (D.C. Cir. 1988) (internal citations omitted); *Long-El v. Fenty*, 593 F. Supp. 2d 50, 52 (D.D.C. 2009) ("Mandamus is proper only if (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff. The party seeking mandamus has the burden of showing that his right to issuance of the writ is clear and indisputable.") (internal citations omitted); *but see Chatman-Bey*, 864 F.2d at 815 (Robinson, J., concurring in judgment) ("I agree,

too, that a writ of mandamus will ordinarily be denied when another avenue to the relief desired is open. But that does not necessarily mean that mandamus, or some other nonhabeas form of action, is out of Chatman-Bey's reach.").

Because he may seek relief through other channels, mandamus is not the appropriate vehicle for Mr. Rojas-Yepes to raise his claims. Rather, the Court will construe his pending Motion to Modify Jail Conditions as a *habeas* petition, inasmuch as a district court certainly has "jurisdiction to entertain a *habeas* petition challenging the conditions of pretrial confinement."[2] *United States v. McGriff*, 468 F. Supp. 2d 445, 447 (E.D.N.Y. 2007). Even construed as a *habeas* petition, however, Mr. Rojas-Yepes' pleading must fail.

The Supreme Court has instructed that, when reviewing institutional restrictions challenged by inmates,

> courts must heed our warning that "[such] considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell v. Wolfish*, 441 U.S. 520, 540 n.23 (1979) (internal citation omitted); *See also Rhodes v. Chapman*, 452 U.S. 337, 350 n.14 (1981) (noting that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators"). It is with this deference in mind that the Court considers Mr. Rojas-Yepes' challenges to his confinement.

Through counsel, Mr. Rojas-Yepes argues that his removal from the general

---

[2] *But see United States v. Medina*, Criminal Action No. 06-232, 2009 U.S. Dist. LEXIS 53137 (D.D.C. June 24, 2009) (declining to construe a similar motion as a *habeas* petition in light of the court's power to "remedy[] constitutional violations" such as those alleged by the defendants).

population at CTF violated his Due Process rights in two ways. First, he believes it was an unwarranted and unconstitutional punitive measure. Second, he implicitly argues that he earned the right to remain in the general population at CTF through his good behavior and the government's failure to classify him as a maximum custody prisoner immediately. The sum of these arguments is that Mr. Rojas-Yepes believes he has either a property or liberty interest in his original placement at CTF and that, in changing his classification from medium to maximum custody and transferring him out of the general population at CTF, the government has deprived him of that interest without due process of law.

The Due Process argument must fail. A liberty interest may arise from the Due Process Clause itself or from state laws or agency regulations. *See Hewitt v. Helms,* 459 U.S. 460, 467 (1983), *overruled in part by Sandin v. Conner*, 515 U.S. 472 (1995); *Hatch v. District of Columbia*, 184 F.3d 846, 849-50 (D.C. Cir. 1999). Yet case law is clear that the Due Process Clause confers upon a prisoner neither a procedural nor substantive due process right to a particular placement or classification. *Hewitt* explains:

> While no State may "deprive any person of life, liberty, or property, without due process of law," it is well settled that only a limited range of interests fall within this provision. Liberty interests protected by the Fourteenth Amendment may arise from two sources — the Due Process Clause itself and the laws of the States. Respondent argues, rather weakly, that the Due Process Clause implicitly creates an interest in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters. While there is little question on the record before us that respondent's confinement added to the restraints on his freedom, we think his argument seeks to draw from the Due Process Clause more than it can provide.

459 U.S. at 467; *see also Marshall v. Reno*, 915 F. Supp. 426, 431 (D.D.C. 1996) ("[T]he Due

Process Clause of the Fourteenth Amendment does not itself give rise to a protected interest in being confined in the general prison population."); *James-Bey v. Freeman*, 638 F. Supp. 758, 761 (D.D.C. 1986) ("The Due Process Clause alone does not protect against transfer of a prisoner to a particular penal institution."). Thus, any interest Mr. Rojas-Yepes might have in his placement or security classification could only come from the DOC's policies or regulations, not from the Due Process Clause itself.

At the show cause hearing, the DOC explained that an inmate's classification is revisited approximately every ninety days because it is *not* a fixed entitlement. As jail administrators become aware of new or different facts, or as events transpire within the jail, officials must be in a position to adjust conditions inside the facility to best ensure safety and order. Initially, the DOC knew only that Mr. Rojas-Yepes was charged with conspiracy. Upon review of the Indictment, however, it learned that he is the alleged leader of a large conspiracy to fly tons of cocaine into the U.S. It then reclassified him based upon the charges and placed him in SMU temporarily because he no longer qualified for housing at CTF. There is simply no basis to find, on these facts, that DOC policy created in Mr. Rojas-Yepes a right to notice and a hearing prior to transfer. As the Supreme Court noted in *Sandin*, "segregated confinement [does] not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." 515 U.S. at 486. Prison regulations are "not designed to confer rights on inmates," but rather to help administrators maintain order in the prison. *Id*. at 481-82. There is no reason to deviate from this precedent here.

Mr. Rojas-Yepes also raises an Equal Protection claim, alleging that he was reclassified as a maximum custody prisoner on the basis of his national origin (Colombia) or "foreigner" status. He argues that he was transferred to SMU "presumably . . . based upon his

national origin and because, in error, the jail facility perceived he does not have family ties within the United States." Defendant's Motion to Modify Jail Conditions at 3 [Dkt. # 122]. He further asserts that "the District claims the decision to lodge all Columbians, including this Defendant, in a maximum-security facility at the DC Jail is coincidental timing . . . ." Defendant's Reply re Motion to Modify Jail Conditions at 2 [Dkt. # 128]. The DOC counters that it considered several factors, including the nature of the charges against Mr. Rojas-Yepes and how much power and influence he was alleged to have had within the conspiracy, and, "using an objective and standardized tool and methodology, determined that Inmate Rojas-Yepes is a maximum custody inmate requiring security precautions." DOC's Response to the Court's Order to Show Cause at 12 [Dkt. # 127]. Further addressing this issue at the show cause hearing, the DOC explained that the decision to reclassify Mr. Rojas-Yepes "was based specifically on this inmates' case" and not on a blanket decision regarding all Colombian prisoners; the allegations against Defendant, naming him as a leader in a high profile international drug-trafficking ring, were enough to require his classification as maximum custody whether he was "from Colombia or from Mississippi." June 5, 2009, Informal Transcript.

In light of the DOC's explanation, Mr. Rojas-Yepes' Equal Protection claim fails. Even if he is correct that most Colombian prisoners were moved simultaneously upon review of the specifics in their respective indictments, a neutral policy or procedure, such as the one described by the DOC here, does not violate the Equal Protection Clause as long as it is rationally related to a legitimate government interest. *United States v. Johnson,* 40 F.3d 436, 439 (D.C. Cir. 1994). The classification procedures here are rationally related to the DOC's legitimate interest in maintaining order and safety in D.C. detention facilities. *See Bell v. Wolfish*, 441 U.S. at 540 (recognizing

Government's "legitimate interests" in managing prison facilities). For a facially neutral policy or action to trigger a higher standard of review, there must be some showing that the policy or action was implemented with a discriminatory purpose. *See Johnson*, 40 F.3d at 439. There has been no such showing here, and the record suggests the contrary.

Finally, Mr. Rojas-Yepes argues that the DOC is estopped from reclassifying him because (1) the DOC had access to the information on which they based the reclassification (the Indictment) the whole time he has been detained but chose not to make use of it, and (2) the DOC "explicitly or implicitly subjected itself to the February 2007 court order" directing Mr. Rojas-Yepes to be placed in the general population at CTF. *see* Order [Dkt. # 43]. The doctrine of equitable estoppel can be applied to government agencies in this context. *Culter v. United States*, 241 F. Supp. 2d 19, 25 (D.D.C. 2003); *Smith v. United States*, 277 F. Supp. 2d 100, 106-07 (D.D.C. 2003). Nonetheless, "the general rule in such circumstances is that mistakes on the part of the government, such as its misinterpretation of applicable law, do not prevent the government from correcting those mistakes when they are discovered." *Culter,* 241 F. Supp. 2d at 25; *see also United States v. Merritt*, 478 F. Supp. 804, 807 (D.D.C. 1979) ("A convicted person will not be excused from serving his sentence merely because someone in a ministerial capacity makes a mistake with respect to its execution."). In the absence of clear injustice to the prisoner, the government is permitted to correct a mistake with respect to a prisoner's classification, or to reclassify a prisoner for any permissible reason.[3]  *See Smith*, 277 F. Supp. 2d at 116 (finding that prisoner's belief that she would serve her sentence in a halfway house did not estop the government from applying a new policy that resulted

---

[3] In the future, however, if the DOC reclassifies and, as a result, seeks to transfer a defendant in the face of a court order regarding his placement, the DOC should seek relief from the court rather than simply ignoring the order.

in her transfer to another facility because the government had the right to transfer her and such transfer was not "egregiously unfair"). Assuming the facts Mr. Rojas-Yepes argues to be true, he nevertheless faces no more than an administrative error which resulted in his initial misclassification. Given that he has no cognizable interest in such a classification in the first place, the DOC cannot be estopped from correcting its mistake.

For the foregoing reasons, the Court finds that Mr. Rojas-Yepes' detention is not unlawful. Mr. Rojas-Yepes' Motion to Modify Jail Conditions [Dkt. # 122] will be denied. Given this result, the Court will vacate Magistrate Judge Kay's February 6, 2007 Order [Dkt. #43] directing that Mr. Rojas-Yepes be held at CTF. A memorializing order accompanies this memorandum Opinion.


Date: June 29, 2009                                     /s/
                                                ROSEMARY M. COLLYER
                                                United States District Judge